**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JANE DOE 43,<br><br>               Plaintiff,<br><br>vs.<br><br>JEFFREY EPSTEIN, GHISLAINE MAXWELL, SARAH KELLEN, LESLEY GROFF, AND NATALYA MALYSHEV,<br><br>              Defendants. | <u>**COMPLAINT**</u><br><br><u>**JURY TRIAL DEMANDED**</u><br><br>CASE NO.: |

Plaintiff Jane Doe 43, by and through her undersigned counsel, for her claims against Defendants Jeffrey Epstein, Ghislaine Maxwell, Sarah Kellen, Lesley Groff, and Natalya Malyshev, alleges upon personal knowledge with respect to her own acts and status and upon information and belief as to all other matters, as follows:

1.      This cause of action arises under federal statutes and jurisdiction is proper under 28 U.S.C. § 1331.

2.      Plaintiff files this Complaint under a pseudonym in order to protect her identity because this Complaint makes allegations of a sensitive sexual nature and disclosure of Plaintiff's name publicly will cause further harm to her.

3.      At all times material to the events alleged in this cause of action the Plaintiff was a citizen of South Africa residing in New York, New York.

4.     At all times material to this cause of action Defendant Jeffrey Epstein had multiple residences, including in New York, New York and the United States Virgin Islands.  He is currently a citizen of the United States and a resident of New York and the U.S. Virgin Islands.

5.     At all times material to this cause of action Defendant Jeffrey Epstein was an adult male born in 1953.

6.     At all times material to this cause of action Defendant Ghislaine Maxwell was residing in in New York, New York and was a citizen of Great Britain and France.

7.     At all times material to this cause of action Sarah Kellen was residing in New York, New York, and, on information and belief, was a citizen of the United States.

8.     At all times material to this cause of action Lesley Groff was residing in New York, New York and, on information and belief, was a citizen of the United States.

9.     At all material times, Natalya Malyshev was residing in New York, New York and, on information and belief, was a citizen of the United States.

10.     Including because a substantial part of the events and omissions giving rise to this cause of action occurred in the Southern District of New York, venue is proper in that District.  28 U.S.C. § 1391(b)(2)

11.     At all times material to this cause of action, Defendants Jeffrey Epstein, Ghislaine Maxwell, Sarah Kellen, Lesley Groff, and Natalya Malyshev owed a duty to Plaintiff to treat her in a non-negligent manner and not to commit or conspire to commit intentional or tortious illegal acts against her.

## FACTUAL ALLEGATIONS

12.     At all times material to this cause of action Defendant Jeffrey Epstein was an adult male over 50 years old.  Defendant Epstein is known as a billionaire who uses his extraordinary wealth to commit illegal sexual crimes in violation of federal and state statutes and to employ numerous others, including the named Defendants, to conspire and assist in committing those crimes and additional torts as well as to protect and conceal his crimes and torts from being discovered.

13.     Defendant Epstein displays his enormous wealth, power and influence to his employees; to the victims procured for sexual purposes; and to the public in order to advance and carry out his crimes and torts.   At all relevant times, Defendant Epstein owned and continues to own, directly or through nominee individuals used to conceal his interests, a fleet of airplanes, motor vehicles, boats and one or more helicopters.  He owned and owns numerous properties and homes, including a 51,000-square-foot mansion in Manhattan; a $30 Million, 7,500-acre ranch in New Mexico; a 70-acre private island formerly known as Little St. James in or near St. Thomas, U.S. Virgin Islands; a mansion in London, England; a home

in Paris, France; and a mansion in Palm Beach County, Florida.  The allegations herein primarily concern the defendant's conduct while at his townhouse in New York; on one or more of his private airplanes; and on his private island in the United States Virgin Islands.

14.     Defendant Epstein has a compulsive sexual preference for young females as young as 13 and as "old" as 25.  Defendant had sex with young females virtually every day and assisted in the development and execution of a sex trafficking scheme designed to fulfill his sexual desires.

15.     Defendant Maxwell was for decades the highest-ranking employee of the Defendants' sex trafficking enterprise.  She herself recruited young females; oversaw and trained other recruiters on how best to recruit girls for sex; developed and executed schemes designed to recruit young females; and ensured that all participants of the Defendants' sex trafficking scheme acted in certain specific ways in order to advance the purposes of the scheme and conceal it from law enforcement.

16.     Defendant Kellen recruited young females and maintained Epstein's sex schedule in order to ensure that he was not without the sexual favors of young females for any extended period of time.  Defendant Kellen also handled travel arrangements for the various females being exploited for sexual purposes.

Defendant Kellen reported directly up the enterprise's line of authority to Defendant Maxwell.

17.     Defendant Epstein employed many recruiters of young females. The nature of the Defendants' sex trafficking scheme enabled victims themselves, such as Defendant Malyshev, to elevate their status to that of a paid recruiter of other victims. Recruiters were taught by Defendants Epstein and Maxwell to inform targeted victims that Epstein possessed extraordinary wealth, power, resources and influence; that he was a philanthropist who would help female victims advance their careers and lives; and that the recruits needed only to provide Epstein with body massages in order to avail themselves of his financial assistance and influence. In fact, however, these representations were fraudulent. The vast majority of girls were required to perform intimate sexual acts at the Defendants' direction and the Defendants did not help or intend to help advance the victims' careers.

18.     Defendant Groff coordinated schedules between Defendant Epstein and the various young females used for sex; made travel arrangements for the girls; tended to their living needs; and communicated with them in order to maintain their compliance with the rules of behavior imposed upon them by the enterprise.

19.     The Defendants, led primarily by Defendants Epstein and Maxwell, fulfilled Epstein's compulsive need for sex with young females by preying on their

personal, psychological, financial, and related vulnerabilities.  The Defendants'

tactics included promising the victims money, shelter, transportation, employment,

admission into educational institutions, educational tuition, and other things of

value in exchange for sex.

20.     Defendants' sex trafficking venture and enterprise operated in a

hierarchal structure with Defendants Jeffrey Epstein and Ghislaine Maxwell at the

top and underlings below.  Underlings included the other named Defendants as

well as unnamed co-conspirators such as various housekeepers and butlers; an

airplane pilot; and various employees, assistants and associates.  Wittingly and

unwittingly, such underlings performed their respective roles with the purpose and

effect of insuring that the enterprise supplied young females to Defendant Epstein

and others for sexual purposes.  At all times materials to this complaint, the

venture and enterprise was a group of two or more individuals associated in fact

and deed.

21.     Defendants Epstein and Maxwell, with help from assistants, associates

and underlings, recruited and procured hundreds of girls over the decades of the

operation of their scheme.  Such recruitment and procurement included fraud,

coercion, the threat of coercion, and a combination of these and similar tactics.

Following the Defendants' recruitment and procurement of the females to join

Epstein in New York and the U.S. Virgin Islands, the Defendants used fraudulent

promises, coercion, and threats of coercion in order to entice young females into sex and, once sexual activities ensued, to cause them to remain in the enterprise. The Defendants also transported females in interstate and foreign commerce and in ways that affected interstate and foreign commerce.

22.     Defendants specifically targeted underprivileged, emotionally vulnerable and/or economically disadvantaged young females to join the Defendants' enterprise.

23.     It is unknown exactly how long Defendant Epstein and Maxwell's aforementioned criminal and illegal enterprise operated, although it was at least continuously and actively in operation from the mid-1990's through and including the calendar year 2007.

24.     Defendant Epstein has continued the enterprise and conspiracy up to the present time.

25.     In 2005, Defendant Epstein and numerous co-conspirators within the enterprise were the subjects of a Palm Beach, Florida Police Department criminal investigation which revealed that Defendant Epstein had engaged in sexual activities with dozens of young teenage children.  Each child was lured into Defendant Epstein's Palm Beach mansion with a promise that she would receive money for providing him with a body massage, although once there, each child was made to engage in a sex act in order to receive the promised compensation.

7

Several were also made to engage in sex with another of Defendant Epstein's female sexual traveling companions.

26.     In 2006, the Palm Beach Police Department investigation was turned over to the FBI and the United States Attorney's Office for the Southern District of Florida.  The United States Attorney's Office investigated Defendant Epstein and his co-conspirators for their violations of numerous federal statutes, including 18 U.S.C. §1591, one of the statutory bases for this complaint.

27.     The United States Attorney's investigation continued from 2006 through September 2007, at which time a Non-Prosecution Agreement was signed between Jeffrey Epstein and the United States Attorney's Office deferring federal prosecution of Defendant Epstein and his numerous co-conspirators for identified federal sex crimes against more than 30 minors.

28.     From late 2006 through September 2007, Epstein's team of lawyers negotiated with the federal government in an effort to avoid the filing of the fifty-three-page draft indictment of Epstein.  During these negotiations, Defendant Epstein decamped from Palm Beach to New York and the U.S. Virgin Islands in order to convey an image to prosecutors that he and his co-conspirators had stopped committing sex crimes.

29.     Remarkably, however—as this case will highlight—Defendant Epstein and his co-Defendants, including the other defendants named herein, did

not abandon their sex trafficking enterprise even while they were under state and federal investigation for crimes committed in violation of 18 U.S.C. § 1591, among other laws, and even as Defendants and their attorneys were busy arguing Epstein's innocence and publicly defaming his victims as liars.  Rather, Defendants merely changed their style.  Instead of targeting local Palm Beach Florida high school girls, the Defendants transported young females from other places in the U.S. and abroad and brought them to Defendant Epstein's mansion in New York and his private island in the Virgin Islands.

30.     In June of 2008, Epstein pleaded guilty to Florida state felony sex offenses for procuring a minor for prostitution and soliciting prostitution by minors.

31.     Defendants Epstein and Maxwell developed and implemented a sophisticated system designed to insulate them from criminal and civil liability by protecting them from potential testimony of knowledgeable subordinates.  The system included requiring subordinates to sign confidentiality agreements covering civil and criminal activity; requiring subordinates and victims to refrain from speaking with law enforcement officials; requiring them to notify Defendant Epstein's lawyers in the event they (subordinates and victims) were contacted by law enforcement officials; requiring them to accept the representation of attorneys paid for by Defendant Epstein; requiring them to invoke the Fifth Amendment in

response to questions they might be asked by investigators and prosecutors; requiring them to invoke the Fifth Amendment in order to refuse to turn over incriminating and non-incriminating evidence to law enforcement officers; requiring them to destroy evidence or refuse to reveal knowledge of destroyed evidence; and requiring them generally to refuse all cooperation with law enforcement officials or investigations.

32.     In 2005, Defendant Epstein and other co-conspirators, aware that law enforcement officials were preparing imminently to execute a search warrant of his home, removed computer systems that logged information about Epstein and his co-conspirators' illegal and criminal conduct; the identities of witnesses; nude photographs of young females; scheduling books; message pads; tangible items such as vibrators and toys; and other incriminating matter.

33.     Commencing in approximately October 2006 and continuing through April 2007, Defendants recruited Plaintiff into their sexual enterprise by fraudulently promising to use their connections and resources to secure her admission to an institution of higher education at the expense of Defendant Epstein.

34.     Defendant Malyshev was working as one of the enterprise's recruiters of young females when she approached and recruited Plaintiff.

35.    Defendant Malyshev informed Plaintiff that she would introduce Plaintiff to Defendant Epstein, whom she described as a wealthy philanthropist who regularly used his wealth, influence and connections to help financially poor females like Plaintiff achieve their personal and professional goals and aspirations.

36.    Defendant Malyshev reported to her superiors, Defendants Kellen, Groff and Maxwell, and was paid for her recruitment of young females, including the recruitment of Plaintiff.

37.    Defendant Malyshev introduced Plaintiff to Defendant Epstein, who confirmed to Plaintiff that he would use his wealth and influence to have Plaintiff admitted into The Fashion Institute of Technology, known as "F.I.T.", in New York City, or into a similar institute of higher learning offering a curriculum of fashion industry training.  Defendants Maxwell, Kellen and Groff each confirmed this promise to Plaintiff many times.

38.    Defendant Maxwell told Plaintiff she would need to provide Defendant Epstein with body massages in order to reap the benefits of his and Maxwell's connections.  Maxwell and Epstein also threatened Plaintiff that, while they had the ability to advance her education and career, they also had the ability to make sure that she would obtain no formal education or modeling agency contracts if she failed to provide the sexual favors desired by Defendant Epstein or abide by the instructions given her by Defendants Epstein and Maxwell.

39.     Plaintiff reasonably believed that her compliance with Defendants' demands was crucial to her physical, psychological, financial, and reputational survival.

40.     Defendant Maxwell instructed Plaintiff how to massage Epstein using the techniques that he preferred.   During Plaintiff's first massage, Defendant Epstein converted it into a sexual act and made it known to Plaintiff that further sex would be required in order for her to obtain the assistance he promised and to avoid Defendants' threatened retaliation if Plaintiff did not perform as demanded.

41.     Defendants Maxwell and Epstein informed Plaintiff that other young females in Defendant Epstein's company were there not only to provide massages, but also sexual acts.

42.     Plaintiff was instructed dozens of times to provide body massages to Defendant Epstein, both at his townhouse in New York and on his private island in the U.S. Virgin Islands.   Each time she was so instructed she was also required to perform a sexual act with Defendant Epstein.   The Defendants transported Plaintiff in interstate and foreign commerce, and affecting interstate and foreign commerce, for these sexual purposes.

43.     During many sexual encounters, Defendant Epstein gave Plaintiff no option, opportunity or choice not to participate in the prescribed sexual acts.

44.     Defendant Maxwell frequently controlled the assignment, or "rotation," of Plaintiff and the other young females concerning the time, place and manner of the sex acts they were told to provide to Defendant Epstein. Defendants Maxwell and Epstein also required Plaintiff to engage in sex acts with other females.

45.     Defendants Epstein and Maxwell intimidated, threatened, humiliated and verbally abused Plaintiff in order to coerce her into sexual compliance. These Defendants threatened Plaintiff with serious harm, as well as serious psychological, financial, and reputational harm, with the purpose and effect of compelling Plaintiff to perform and continue performing the demanded commercial sexual activity.

46.     On one occasion, after suffering verbal abuse and threats by Defendants Epstein, Maxwell, and Kellen, Plaintiff attempted to escape from Defendant Epstein's private island.   A search party led by Defendant Epstein located her and physically returned her to the main house on the island.  Through these and other actions, the Defendants intended to cause, and did cause, Plaintiff to believe that failure to perform the actions they requested would result in physical restraint and potential harm to her person, as well as harm to her reputation, employability, and stable state of mind.

47.     Defendant Epstein's wealth, influence, power and connections were used both as an inducement to provide sex (in exchange for promises of support), and as a means of threatening punishment (should Plaintiff refuse to comply with Defendants' instructions).

48.     In addition to Plaintiff's being trafficked on Defendant Epstein's private plane, Defendants Groff, Maxwell and Kellen, with the knowledge of and instruction by Defendant Epstein, arranged Plaintiff's commercial air travel on numerous occasions for the purpose of causing Plaintiff to commit commercial sex acts.

49.     Defendants provided living quarters for Plaintiff at 301 East 66 Street, New York; a car service for Plaintiff to use as needed; a cell phone; and other valuable consideration in order to maintain Plaintiff's sexual compliance.

50.     The relationship between Plaintiff and Defendants Epstein and Maxwell was defined and characterized by Defendant Epstein's and Defendant Maxwell's frequent and persistent fraudulent representations that they would provide Plaintiff with a formal education and career advancement if she provided sex to Defendant Epstein and others in the times, places and manners demanded by Defendants.  Plaintiff reasonably relied on those representations.  In fact, however, those representations were knowingly false, were not acted upon, and were made by Defendants Epstein and Maxwell solely for the purpose of maintaining

Plaintiff's financial dependence on, emotional vulnerability to, and sexual compliance with Defendants Epstein and Maxwell and their demands. The other Defendants intentionally repeated those representations and intentionally attempted to convince Plaintiff that the representations were true and could be relied upon.

51.     In January 2007, Defendants sent Plaintiff from the United States to South Africa in part to recruit, for a promised fee, one or more aspiring female models supposedly for Defendant Epstein to use as an alleged personal assistant. Defendants Epstein and Maxwell continuously and frequently demanded that Plaintiff fulfill this task as a condition of her receiving the education, career and related benefits promised by Defendants Epstein and Maxwell. Based upon Plaintiff's experience with Defendants, however, she did not believe that the requested model would be placed in a legitimate position of employment with Defendant Epstein but would, instead, be forced into sexual servitude. As a result, Plaintiff deliberately refused to perform the recruitment assignment.

52.     As part of their ongoing scheme, Defendants inflicted serious emotional and psychological harm on Plaintiff as a means of coercing her to continue engaging in commercial sex acts. While Plaintiff was in South Africa, Defendants Epstein and Maxwell informed Plaintiff that she would not be permitted to return to the United States to receive her promised education unless she underwent a diet and lowered her body weight from 57 kilograms

(approximately 125 pounds) to 52 kilograms (approximately 114 pounds). Believing she had no practical choice in the matter, Plaintiff attempted to comply with the order but, given her physical height and structure and her existing low body weight, the diet imposed upon her placed her in serious physical jeopardy, including kidney malfunction and extreme emotional and psychological distress.

53.    Defendants Epstein and Maxwell called Plaintiff's parents in South Africa to tell them that Defendants would take good care of Plaintiff when she returned to the United States and that they would use their connections and influence to have her admitted to F.I.T. or another well-regarded fashion school.

54.    In February of 2007, Plaintiff returned to New York and was promptly ordered by Defendant Maxwell to have sex with Defendant Epstein.  Defendants Maxwell and Epstein fraudulently promised her again that her sexual compliance would be rewarded with admission to F.I.T. or a comparable college, a promise which they knew to be false.  Plaintiff knew that if she did not comply, Defendants Maxwell and Epstein would use their power, influence and connections in order to ensure that Plaintiff was unable to gain admission to F.I.T. or a comparable school, and that they would destroy her career as they had destroyed the careers of others who had failed to comply.

55.    Defendants Epstein and Maxwell continued to provide Plaintiff with things of value in exchange for Plaintiff's continued compliance with Epstein's

sexual demands; however, they failed and refused to perform their promises to help Plaintiff be admitted to F.I.T. or another school, or to provide financial support for college admission or on-going education, false promises they repeatedly made in order to coerce her into commercial sex acts.

56.    Defendants Epstein and Maxwell's sexual demands on Plaintiff continued while she was in New York or other geographic proximity to the Defendants.  In addition to their requiring Plaintiff to provide Defendant Epstein with sex acts, Defendants continued to pressure her to lose excessive amounts of body weight and offered her no opportunity to decline or resist their instructions.

57.    In May, 2007, Plaintiff left the United States and did not return.

58.    Defendants' representations and promises were all false and fraudulent.  Their threats were considered by Plaintiff to be real and credible.  All such representations, promises and threats were made solely for the purpose of coercing and otherwise inducing Plaintiff into prolonged sexual compliance. Defendants knowingly benefitted financially and received things of value as a result of their participating in their illegal enterprise.

## COUNT I

## CAUSE OF ACTION AGAINST DEFENDANTS PURSUANT TO 18 U.S.C. § 1595

59.    Plaintiff adopts and realleges paragraphs 1 through 58 above.

60.     Defendants individually and together, within the special maritime and territorial jurisdiction of the United States, in interstate and foreign commerce and/or affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, maintained, patronized, solicited, threatened, forced, and coerced Plaintiff to engage in commercial sex acts.  Such actions by Defendants were undertaken with knowledge and/or reckless disregard of the fact that their threats of force, fraud, coercion, and combinations of such means would be used, and were in fact used, in order to cause Plaintiff to engage in commercial sex acts.  In so doing, Defendants violated 18 U.S.C. §§1591 through 1594 and are subject to civil causes of action under 18 U.S.C. § 1595.

61.     Defendants additionally profited from the sex trafficking of Plaintiff; obstructed investigations of the violations; attempted and conspired to violate, and succeeded in violating, 18 U.S.C. §§ 1591 through 1595, by the commission of the torts and crimes described in this complaint.

62.     Certain property of Defendant Epstein's was essential to the commission of the federal crimes and torts described herein, including the use of multiple private aircraft including a Boeing aircraft (of make and model B-727-31H with tail number N908JE) and a Gulfstream aircraft (of make and model G-1159B with tail number N909JE).  Such aircraft, along with other of Defendants'

property, were used as means and instruments of Defendants' tortious and criminal offenses and, as such, are subject to forfeiture.

63.     Additionally, Defendant Epstein's New York mansion, located at 9 East 71st street, New York, New York, and his private island located in the United States Virgin Islands, were used as means and instruments of Defendants' tortious and criminal offenses and, as such, are subject to forfeiture.

64.     As a direct and proximate result of Defendants' commission of the aforementioned criminal offenses enumerated in Title 18 U.S.C. § 1591 et. seq. and the civil remedies provided in § 1595, Plaintiff has in the past suffered and will continue to suffer injury and pain; emotional distress; psychological and psychiatric trauma; mental anguish; humiliation; confusion; embarrassment; loss of self-esteem; loss of dignity; loss of enjoyment of life; invasion of privacy; and other damages associated with Defendants' actions.  Plaintiff will incur medical and psychological expenses.  These injuries are permanent in nature and Plaintiff will continue to suffer from them in the future.  In addition to these losses, Plaintiff has incurred attorneys' fees and will do so in the future.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, attorney's fees, punitive damages and such other and further relief as this Court deems just and proper.  Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

Dated:  January 26, 2017

Respectfully Submitted,

BOIES, SCHILLER & FLEXNER LLP

By:  /s/ David Boies
David Boies
Boies Schiller & Flexner LLP
333 Main Street
Armonk, New York 10504
T: (914) 749 8200
E: dboies@bsfllp.com

Alex Boies
Boies Schiller & Flexner LLP
575 Lexington Ave., 7th Fl.
New York, New York 10022
T: (212) 446-2300
E: aboies@bsfllp.com

Sigrid McCawley
Meredith Schultz
Boies Schiller & Flexner LLP
401 East Las Olas Blvd., Ste. 1200
Fort Lauderdale, Florida 33301
T: (954) 356-0011
E: smccawley@bsfllp.com
E: mschultz@bsfllp.com
*Pro Hac Vice to be filed*

Bradley J. Edwards
Farmer, Jaffe, Weissing, Edwards,
Fistos & Lehrman, P.L.
425 North Andrews Ave., Ste. 2
Fort Lauderdale, Florida 33301
T: (954) 524-2820
E: brad@pathtojustice.com
*Pro Hac Vice to be filed*

J. Stanley Pottinger
J. Stanley Pottinger PLLC
Suite 100
49 Twin Lakes Road
South Salem, New York 10590
T: (914) 763-8333
E: stanpottinger@aol.com