UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO.: 1:17-CV-00616

JANE DOE 43,

      Plaintiff,

vs.

JEFFREY EPSTEIN, GHISLAINE MAXWELL,
SARAH KELLEN, LESLEY GROFF,
AND NATALYA MALYSHEV,

      Defendants.
_____/

## FIRST AMENDED COMPLAINT

Plaintiff JANE DOE 43, by and through her undersigned counsel, for her claims against Defendants Jeffrey Epstein, Ghislaine Maxwell, Sarah Kellen, Lesley Groff, and Natalya Malyshev, alleges upon personal knowledge with respect to her own acts and status, and upon personal knowledge, information and belief as to all other matters, as follows:

1.   This cause of action arises under federal statutes and jurisdiction is proper under 28 U.S.C. section 1331.

2.   Plaintiff files this Complaint under a pseudonym in order to protect her identity because this Complaint makes allegations of a sensitive sexual nature the disclosure of which, in association with her name, would cause further harm to her.

1

3.   At all times material to the events alleged in this cause of action the Plaintiff was a citizen of South Africa residing in New York, New York.

4.   At all times material to this cause of action Defendant Jeffrey Epstein had multiple residences, including in New York, New York (within the Southern District of New York) and the United States Virgin Islands.  He is currently a citizen of the United States and claims to be a resident of the U.S. Virgin Islands.

5.   At all times material to this cause of action Defendant Jeffrey Epstein was an adult male born in 1953.

6.   At all times material to this cause of action Defendant Ghislaine Maxwell was residing in in New York, New York and was a citizen of Great Britain and France.

7.   At all times material to this cause of action Sarah Kellen was a United States citizen, residing in New York, New York (within the Southern District of New York).

8.   At all times material to this cause of action Lesley Groff was a United States citizen, employed by New York based company and regularly conducting business in New York, New York (within the Southern District of New York).

9.   A substantial part of the acts, events, and omissions giving rise to this cause of action occurred in the Southern District of New York; venue is proper in that District.  28 U.S.C. section 1391(b)(2)

10. At all times material to this cause of action, Defendants Jeffrey Epstein, Ghislaine Maxwell, Sarah Kellen, and Lesley Groff owed a duty to Plaintiff to treat her in a non-negligent manner and not to commit or conspire to commit intentional, criminal, fraudulent, or tortious acts against her, including any acts in violation of 18 U.S.C. §1595.

## FACTUAL ALLEGATIONS

11. At all times material to this cause of action, Defendant Jeffrey Epstein was an adult male over 50 years old. Defendant Epstein is widely recognized as a billionaire who uses his extraordinary wealth to commit illegal sexual crimes in violation of federal and state statutes and to employ and conspire with a group of numerous others, including each of the named Defendants, to assist in committing those crimes and additional torts as well as to conceal the crimes and torts of the Epstein sex trafficking group from being discovered.

12. Defendant Epstein displays his enormous wealth, power and influence to his employees; to the victims procured for sexual purposes; and to the public in order to advance and carry out his crimes and torts. At all relevant times, Defendant Epstein owned and continues to own, directly or through nominee individuals used to conceal his interests, a fleet of airplanes, motor vehicles, boats and one or more helicopters. For example, he owned (directly or indirectly) a Boeing aircraft (of make and model B-727-31H with tail number N908JE) and a Gulfstream aircraft

3

(of make and model G-1159B with tail number N909JE). He also owned numerous properties and homes, including a 51,000-square-foot mansion in Manhattan; a $30 Million, 7,500-acre ranch in New Mexico; a 70-acre private island formerly known as Little St. James in or near St. Thomas, U.S. Virgin Islands; a home in Paris, France; and a mansion in Palm Beach County, Florida. The allegations herein primarily concern the defendant's conduct while at his townhouse in New York; on one or more of his private airplanes; and on his private island in the United States Virgin Islands. Epstein used all of the real and personal property described in this paragraph to facilitate the illegal sex trafficking venture and enterprise described in this Complaint and in furtherance of that venture and enterprise.

13. Defendant Epstein has a compulsive sexual preference for young females as young as 13 and as "old" as 25. Through information and belief Defendant Epstein engages in sexual acts with this age range every day and developed, through the employment of and conspiracy with the other Defendants, a sex trafficking venture and enterprise designed to fulfill his sexual desires and conceal the operation of the venture and enterprise and conduct of its participants. As part of the venture and enterprise, Epstein also provided young females for sexual purposes to his friends in order to secure social, business, and other contacts as well as other things of value.

14.  Defendant Maxwell was for decades the highest-ranking employee of the Defendants' sex trafficking venture and enterprise.  She herself recruited young, including underage, females; oversaw and trained other recruiters on how best to recruit girls for sex; developed and executed schemes designed to recruit young females; and ensured that all participants of the Defendants' sex trafficking scheme acted in certain specific ways in order to advance the purposes of the scheme, including providing young females to Epstein for sexual purposes on a daily basis, and concealing these activities from law enforcement.

15.  Defendant Kellen recruited young females for Epstein for sexual purposes, brought gifts to females in order to entice those females to commit sex acts with Epstein and to assist in concealing the illegal sexual conduct of the venture and enterprise, and maintained Epstein's sex schedule in order to ensure that he was not without young females for any extended period of time.  Defendant Kellen also handled travel arrangements for various females being exploited for sexual purposes.  Defendant Kellen was an integral part of the sex trafficking venture and enterprise and reported directly up the enterprise's line of authority to Defendants Maxwell and Epstein.

16.  Defendant Epstein employed many recruiters of young females.  The nature of the Defendants' sex trafficking venture and enterprise enabled victims themselves to elevate their status to that of a paid recruiter of other victims.

Recruiters were taught by Defendants Epstein, Maxwell and Kellen to inform targeted victims that Epstein possessed extraordinary wealth, power, resources and influence; that he was a philanthropist who would help female victims advance their careers and lives; and that the recruits needed only to provide Epstein with body massages in order to avail themselves of his financial assistance and influence. In fact, however, these representations were fraudulent. The young females were actually required to perform intimate sexual acts at the Defendants' direction and the Defendants did not help nor intend to help advance the victims' careers. Victims were also paid to bring Epstein other young females for sex and were told by Defendants Epstein, Maxwell, and Kellen that those young females who brought other females would further benefit from bringing other girls.

17. Defendant Groff was an integral part of the illegal venture and enterprise. Groff coordinated schedules between Defendant Epstein and the various young females used for sex; made travel arrangements for the young females; tended to the living needs of those females; communicated and coordinated with Defendants Epstein, Maxwell and Kellen to assist in facilitating young females being available in locations where the other Defendants were traveling; and she carried messages to the young females from the other Defendants including false representations in order to maintain the young females' compliance with the rules of sexual compliance imposed by this structured sex-trafficking group. Groff was aware of

the activities of the venture and enterprise, including the fraudulent representations and other coercion that was being applied to secure the females' compliance with demands of sex.

18.  The Defendants, led primarily by Defendants Epstein and Maxwell, fulfilled Epstein's compulsive need for sex with young females by preying on their personal, psychological, financial, and related vulnerabilities.  The Defendants' tactics included promising the victims money, shelter, transportation, gifts, employment, admission into educational institutions, educational tuition, protection, and other things of value in exchange for sex.  Defendants also took possession of the victims' passports to coerce compliance with their demands. Defendants also trafficked young females to Epstein's friends and acquaintances in order to secure financial and other benefits as well as social, educational, and business connections.

19.  Defendants' sex trafficking venture and enterprise operated in a hierarchal structure with Defendants Jeffrey Epstein and Ghislaine Maxwell at the top. Defendants Epstein and Maxwell operated the sex trafficking scheme dating back to at least the mid-nineties, and over the years perfected their roles and the roles of others, both in terms of the ability to increase the volume of young females recruited for sex and in insulating the enterprise from criminal investigation or prosecution.  Defendant Groff conspired with Defendant Epstein and Maxwell

since at least 2002 and continues to work for Defendant Epstein today. Defendant Kellen began working with the Epstein-run sex trafficking venture and enterprise as early as 2001 and her role in their venture and enterprise was well-defined and primarily consisted of conspiring in the commission and cover-up of sex crimes. Underlings included the other named Defendants as well as unnamed co-conspirators such as various housekeepers and butlers; an airplane pilot; and various employees, assistants and associates. Wittingly and unwittingly, such underlings performed their respective roles with the purpose and effect of insuring that the enterprise supplied young females to Defendant Epstein and others for sexual purposes. At all times materials to this complaint, the venture and enterprise was a group of two or more individuals associated in fact and deed.

20. Defendants Epstein and Maxwell, with help from assistants, associates and underlings, recruited and procured hundreds of girls over the decades of the operation of their scheme. Such recruitment and procurement included fraud, coercion, threats, intimidation, fear, the threat of coercion, and a combination of these and similar tactics. Following the Defendants' recruitment and procurement of the young females to join Epstein in New York and the U.S. Virgin Islands, the Defendants used fraudulent promises, coercion, and threats of coercion in order to entice and coerce the females into sex and, once sexual activities ensued, to cause them to remain in the enterprise. The Defendants also transported females in

interstate and foreign commerce and in ways that affected interstate and foreign commerce. The sex acts were commercial in nature, because the Defendants promised to provide financial and other compensation to the females in exchange for providing sex acts to Epstein.

21. Defendants specifically targeted underprivileged, emotionally vulnerable and/or economically disadvantaged young females to provide sex for Epstein.

22. Additionally, Defendants always made clear to every young female that they were wealthy, well-connected and could either help or hurt the females depending on their degree of cooperation. In fact, Defendants Epstein and Maxwell have been known to threaten young females with physical harm. It is unknown exactly how long the Defendants' criminal and illegal venture and enterprise operated, although it was at least continuously and actively in operation from the mid-1990's through and including the calendar year 2007.

23. Defendant Epstein has continued the venture and enterprise up to the present time in some form or another and with additional co-conspirators and participants.

24. In 2005, Defendant Epstein and numerous co-conspirators within the venture and enterprise were the subjects of a Palm Beach, Florida Police Department criminal investigation which revealed that Defendant Epstein had engaged in sexual activities with dozens of young teenage school children. Each child identified in that particular investigation was lured into Defendant Epstein's Palm

Beach mansion with a promise that she would receive money for providing him with a body massage, although once there, each young female was made to engage in sexual acts in order to receive the promised compensation. Several were also made to engage in sex with another of Defendant Epstein's female traveling sex companions who Epstein referred to as his lesbian sex slave and bragged about purchasing her from her family when she herself was underage.

25. In 2006, the Palm Beach Police Department investigation was turned over to the FBI and the United States Attorney's Office for the Southern District of Florida. The United States Attorney's Office investigated Defendant Epstein and his co-conspirators for their violations of numerous federal statutes, including 18 U.S.C. Section 1591, one of the statutory bases for this complaint.

26. The United States Attorney's investigation continued from 2006 through September 2007, at which time a Non-Prosecution Agreement was signed between Jeffrey Epstein and the United States Attorney's Office deferring federal prosecution of Defendant Epstein and his numerous co-conspirators, including Defendants Kellen and Groff, each named by the Federal Government as co-conspirators, for identified federal sex crimes against more than 30 minors.

27. From late 2006 through September 2007, Epstein's team of lawyers negotiated with the federal government in an effort to avoid a fifty-three-page Federal felony indictment from being filed against Epstein. During these

10

negotiations, Defendant Epstein decamped from Palm Beach to New York and the U.S. Virgin Islands in order to convey an image to prosecutors that he and his co-conspirators had stopped committing sex crimes.

28.  Remarkably, however—as this case will highlight—Defendant Epstein and his co-Defendants, including the other defendants named herein, did not abandon their sex trafficking venture and enterprise even while they were under state and federal investigation for crimes committed in violation of 18 U.S.C. section 1591, among other laws, and even as Defendants and their attorneys were busy arguing Epstein's innocence and publicly defaming his victims as liars.  Rather, Defendants merely changed their location.  Instead of targeting local Palm Beach Florida school girls, the Defendants transported young females from other places in the U.S. (including the Southern District of New York) and abroad and brought them to Defendant Epstein's mansion in New York City and his private island in the Virgin Islands.

29.  In June of 2008, Epstein pleaded guilty to Florida state felony sex offenses for procuring a minor for prostitution and soliciting prostitution by minors and registered as a Sex Offender for Life.

30.  Defendants Epstein and Maxwell developed and implemented a sophisticated system designed to insulate them from criminal and civil liability by protecting them from potential testimony of knowledgeable subordinates.

Defendants Kellen and Groff adapted to the system and also carried it out for years in exchange for significant pay, benefits, and protection from prosecution. The system included requiring subordinates to sign confidentiality agreements barring disclosure of criminal activity; maintaining records of underage females who were abused by Epstein; requiring subordinates and victims to refrain from speaking with law enforcement officials; requiring them to notify Defendant Epstein's lawyers in the event they (subordinates and victims) were contacted by law enforcement officials; requiring them to accept the representation of attorneys paid for by Defendant Epstein; requiring them to invoke the Fifth Amendment in response to questions they might be asked by investigators and prosecutors; requiring them to invoke the Fifth Amendment in order to refuse to turn over incriminating and non-incriminating evidence to law enforcement officers; requiring them to destroy evidence or refuse to reveal knowledge of destroyed evidence; and requiring them generally to refuse all cooperation with law enforcement officials or investigations.

31. In 2005, Defendant Epstein and other co-conspirators, aware that law enforcement officials were preparing imminently to execute a search warrant for his home, removed computer systems that logged information about Epstein and his co-conspirators' illegal and criminal conduct; the identities of witnesses; nude

photographs of young females; scheduling books; message pads; tangible items such as vibrators and toys; and other incriminating matter.

32.  The sex recruiting and trafficking venture and enterprise designed to procure young females for sexual purposes and to conceal those activities was developed and fine-tuned over time, and each of the named Defendants had a well-defined role and improved in his/her role over time, with practice and experience.  By the time Plaintiff was recruited into victimization, each Defendant had years of experience perfecting methods of coercion, understanding Epstein's requirements, and becoming more loyal to the continuance and survival of the venture and enterprise.  All of the Defendant's knew about the activities of the venture and enterprise and worked in concert for the goals of the venture and knowingly benefitted, financially and by receiving things of value, from their participation in the venture and enterprise.

33. A typical way the Defendants procured young females for sex with Defendant Epstein was to make false promises of a modeling opportunity, offer a better life, offer payment for a formal education, or offer other money or consideration.

34. Beginning in approximately October 2006 and continuing through April 2007, Defendants recruited Plaintiff into their sexual enterprise by fraudulently

promising to use their connections and resources to secure her admission to an institution of higher education at the expense of Defendant Epstein.

35.  One of the enterprise's many recruiters, Natalya Malyshev, was working to recruit young females for Epstein for sex when she approached and recruited Plaintiff.

36.  Malyshev informed Plaintiff that she would introduce Plaintiff to Defendant Epstein, whom she described as a wealthy philanthropist who regularly used his wealth, influence and connections to help financially poor females like Plaintiff achieve their personal and professional goals and aspirations.

37.  Malyshev reported to her superiors, Defendants Kellen, Groff and Maxwell, and was paid for her recruitment of young females, including Plaintiff.

38.   Malyshev introduced Plaintiff to Defendant Epstein, who confirmed to Plaintiff that he would use his wealth and influence to have Plaintiff admitted into The Fashion Institute of Technology (known as "F.I.T.") in New York City or into a similar institute of higher learning offering a curriculum of fashion industry training.  Between October 2006 and May 2007, Defendants Maxwell, Kellen, and Groff each also confirmed and reiterated this promise to Plaintiff many times, each telling Plaintiff that Epstein would use his wealth and connections to advance Plaintiff's education.  More specifically, each of the Defendants last verified this information that Epstein was using his connections to ensure Plaintiff was admitted

into F.I.T. in exchange for Plaintiff's continued sexual cooperation with Epstein in March or April of 2007.

39. Defendant Maxwell told Plaintiff she would need to provide Defendant Epstein with body massages in order to reap the benefits of his and Maxwell's connections.

40. All Defendants, including Maxwell, Epstein, Groff and Kellen, knew that Plaintiff was actually being recruited for sexual purposes, and each knowingly and deliberately made false representations to ensure that Plaintiff would cooperate in fulfilling Epstein's sexual desires. These false and fraudulent representations included Defendants' telling Plaintiff that Epstein would use his connections to have her admitted into F.I.T. or a similar institute, college, university or school of higher learning and provide her with employment opportunities. Plaintiff reasonably relied on these representations and had a credible basis for such reliance, including the credible representations of Epstein and the other Defendants that they possessed extensive political, business, financial, social, and educational influence and connections. Epstein and the other Defendants represented to Plaintiff in manners that were persuasive, credible, and reasonable to Plaintiff, as they would have been to any other person similarly situated, that they had the political, business, financial, social, educational, and other influence and

connections sufficient to arrange for and insure her admission into F.I.T. or a similar school of higher learning.

41. Maxwell and Epstein also threatened Plaintiff that, while they had the ability to advance her education and career, they also had the ability to make sure that Plaintiff would not obtain formal education or modeling agency contracts if she failed to provide the sexual favors desired by Defendant Epstein or abide by the instructions given her by Defendants Epstein, Groff, Kellen and Maxwell.

42. Plaintiff reasonably believed that her compliance with Defendants' demands was crucial to her physical, psychological, financial, and reputational well-being and survival.

43. Defendant Maxwell instructed Plaintiff how to massage Epstein using the techniques that Maxwell knew that Epstein preferred. During Plaintiff's first massage, Defendant Epstein converted it into a sexual act and made it known to Plaintiff that further sex would be required in order for her to obtain the assistance he promised her and to avoid Defendants' threatened retaliation against her if Plaintiff did not perform as demanded.

44. Maxwell and Epstein informed Plaintiff that other young females in Epstein's company were there also to perform sexual acts for Epstein and his friends. Groff and Kellen helped to secure the presence of the other young females for these purposes.

45. Plaintiff was instructed dozens of times to provide body massages to Epstein, both at his townhouse in New York and on his private island in the U.S. Virgin Islands. Each time she was so instructed she was also required to perform a sexual act with Epstein. The Defendants all participated in arranging for Plaintiff to be transported in interstate and foreign commerce, and affecting interstate and foreign commerce, for these sexual purposes. The Defendants Epstein, Maxwell, and Kellen used possession and control of Plaintiff's passport to induce and coerce Plaintiff into performing sexual acts with Epstein and others.

46. During many sexual encounters, Defendant Epstein gave Plaintiff no option, opportunity, or choice not to participate in the prescribed sexual acts.

47. Defendant Maxwell frequently controlled the assignment, or "rotation," of Plaintiff and the other young females concerning the time, place and manner of the sex acts they were told to provide to Defendant Epstein. Defendant Maxwell also gave instructions on how to perform certain sexual techniques on Epstein. Defendants Maxwell and Epstein also required Plaintiff to engage in sex acts with other females.

48. Defendants Epstein and Maxwell intimidated, threatened, humiliated and verbally abused Plaintiff in order to coerce her into sexual compliance. These Defendants threatened Plaintiff with serious harm, as well as serious

psychological, financial, and reputational harm, compelling Plaintiff to perform and continue performing the commercial sexual activity demanded by Defendants.

49. On one occasion, after suffering verbal abuse and threats by Defendants Epstein, Maxwell, and Kellen, Plaintiff attempted to escape from Defendant Epstein's private island. A search party led by Defendants Epstein and Maxwell located her and physically returned her to the main house on the island. Through these and other actions, the Defendants intended to cause, and did cause, Plaintiff to believe that failure to perform the actions they requested would result in physical restraint and potential harm to her person, as well as harm to her reputation, employability, and stable state of mind. Defendants further used possession and control of Plaintiff's passport, without lawful consent or authority, to restrict Plaintiff's liberty and thereby force her to provide sex to Epstein.

50. Defendant Epstein's wealth, influence, power and connections were used by Defendants Maxwell, Kellen, and Groff, both as an inducement to provide sex (in exchange for promises of support to Plaintiff) and as a means of threatening punishment (in the event Plaintiff refused to comply with Defendants' instructions to provide sex to Epstein and others).

51. In addition to Plaintiff's being trafficked on Epstein's private airplane, Defendants Groff, Maxwell and Kellen, with the knowledge of and instruction by Defendant Epstein, arranged Plaintiff's living accommodations, private car travel,

and commercial air travel on numerous occasions for the purpose of causing Plaintiff to commit commercial sex acts. These Defendants worked in concert with one another to recruit, procure, entice, and otherwise cause many other females to engage in commercial sex acts, through their use of threats, fraud, and coercion. Among these means of coercion were the Defendant's possession and control of the females' passports and other immigration documents. This coercion was most salient, and especially effective, while the females, including Plaintiff, were on Epstein's island.

52. In furtherance of their venture and enterprise, Defendants provided living quarters for Plaintiff at 301 East 66th Street, New York, in the Southern District of New York; a car service for Plaintiff to use as needed; a cell phone; and other valuable consideration in order to maintain Plaintiff's sexual compliance. Each of the Defendants told Plaintiff she would obtain the benefits of a place to live and phone and transportation as long as she remained compliant with their demands that she service Epstein sexually. Each of the Defendants also told her that if she was not compliant, these benefits would be taken from Plaintiff.

53. The relationship between Plaintiff and Defendants Epstein and Maxwell was defined and characterized by Defendant Epstein's and Defendant Maxwell's frequent and persistent fraudulent representations that they would provide Plaintiff with a formal education and career advancement if she provided sex to Defendant

Epstein and others in the times, places and manners demanded by Defendants. Defendants Groff and Kellen each also told Plaintiff that Defendant Epstein would advance Plaintiff's education and career in order to coerce Plaintiff into sex. Defendant Kellen told Plaintiff that Epstein had done the same for her career. As a result of these and other representations by Defendants, Plaintiff reasonably relied on these representations. In fact, however, these representations were knowingly false, were not acted upon by Defendants, and were made by Defendants Epstein, Groff, Kellen, and Maxwell solely for the purpose of maintaining Plaintiff's financial dependence on, emotional vulnerability to, and sexual compliance with Defendant Epstein's demands. The other Defendants intentionally repeated these representations and intentionally made statements designed to convince Plaintiff that the representations were true and could be relied upon. These representations and statements were made to Plaintiff in furtherance of the sex trafficking venture and enterprise for which they were each employed.

54. As part of the venture and enterprise, Defendants Epstein, Maxwell, and Kellen took possession of Plaintiff's passport when she was being trafficked by them, including when she travelled to Epstein's island in the U.S. Virgin Islands. The Defendants took possession of Plaintiff's passport in the course of sexually trafficking Plaintiff and with the intent to violate laws against sex trafficking, including 18 U.S.C. 1591 et. seq. The Defendants used their control of Plaintiff's

passport in order to coerce compliance with their demands, including their demands that Plaintiff have sex with Epstein and others.

55.   In January 2007, as part of their illegal venture and enterprise, Defendants sent Plaintiff from New York City, in the Southern District of New York, to South Africa to recruit, for a promised fee, one or more aspiring female models supposedly for Epstein to use as a personal assistant.  The Defendants did not care whether the prospective female was qualified to work as a personal assistant because each knew that the female recruit would be immediately placed into the same sexually vulnerable position as Plaintiff (and the dozens of other victims of the sex trafficking enterprise) and would be induced and coerced into being used for sex through fraudulent representations and other means.

56.   Defendants Epstein and Maxwell continuously and frequently demanded that Plaintiff fulfill this task of bringing another female back to the United States and Defendants' control as a condition of Plaintiff's receiving the education, career and related benefits promised by Defendants Epstein and Maxwell.  Based upon Plaintiff's experience with Defendants, however, she knew that the requested female model would not be placed in a legitimate position of employment with Defendant Epstein but would, instead, be forced into sexual servitude.  Plaintiff also knew that this objective was the only purpose of Defendants Kellen, Groff,

Maxwell and Epstein's demand for Plaintiff's recruitment efforts. As a result, Plaintiff deliberately refused to perform the recruitment assignment.

57. As part of their ongoing scheme, Defendants inflicted serious emotional and psychological harm on Plaintiff as a means of coercing her to continue engaging in commercial sex acts with Epstein and others. While Plaintiff was in South Africa, Defendants Epstein and Maxwell informed Plaintiff that she would not be permitted to return to the United States to receive her promised education unless she underwent a diet and lowered her body weight from 57 kilograms (approximately 125 pounds) to 52 kilograms (approximately 114 pounds). Epstein and Maxwell promised Plaintiff that, if she complied, she would receive her promised education. Defendant Groff monitored Plaintiff's progress in losing weight and continued to communicate with Plaintiff about Plaintiff's application to be admitted into F.I.T. as part of the Defendants' ruse to coerce Plaintiff to return to the United States for sex. Defendant Groff was aware of the coercion Epstein and Maxwell were applying to Plaintiff and acted to help further that coercion. Believing she had no practical choice in the matter, Plaintiff attempted to comply with the order but, given her physical height and body structure and her already existing body weight, the diet imposed upon her placed her in serious physical jeopardy, including kidney malfunction and extreme emotional and psychological distress.

58.    As part of their scheme, Defendants Epstein and Maxwell called Plaintiff's parents in South Africa to tell them that Defendant Epstein would take good care of Plaintiff when she returned to the United States, and that Defendants Maxwell and Epstein would use their connections and influence to have her admitted to F.I.T. or another well-regarded fashion school or school of higher learning.

59.    As part of their scheme, Epstein and Groff told Plaintiff that she should fill out an application for admission to F.I.T., and supporting essay, and send it to Epstein for his review.   Pursuant to these instructions, Plaintiff completed an application, and supporting essay, and sent it to Epstein.   As part of his scheme, Epstein told Plaintiff that he had reviewed these materials.   His statements were intended to convince Plaintiff, and had the effect of convincing plaintiff (as they would have convinced any reasonable person), that her admission to F.I.T. was a "done deal" if she would comply with his instructions.   Groff also made the same representations to plaintiff on Epstein's behalf.   Plaintiff reasonably relied on these representations by Epstein and Groff.

60.   As part of their scheme, Epstein and Maxwell told Plaintiff that they had contacts at F.I.T. and at modeling agencies who could ensure her admission to F.I.T. and advance Plaintiff's career.   As part of their scheme, Epstein and Maxwell told Plaintiff about Epstein's vast wealth and specifically identified him as a billionaire.   Epstein and Maxwell told Plaintiff that they had extensive

contacts, in addition to those identified above, throughout New York City and elsewhere.

61. In February of 2007, in reliance on promises made by the Defendants, Plaintiff returned to New York City, in the Southern District of New York, and was promptly ordered by Defendant Maxwell to have sex with Defendant Epstein. Defendants Maxwell, Kellen, Groff, and Epstein each fraudulently promised Plaintiff again that her sexual compliance would be rewarded with admission to F.I.T. or a comparable college, a promise which they each knew to be false. In fact all four Defendants had for years worked solely to recruit females for sex and to conceal the operation of the sex scheme, and in 2007 were under Federal investigation for their conspiracy to engage in Federal sexual crimes like those committed against Plaintiff. Plaintiff knew that if she did not comply, Defendants Maxwell and Epstein would use their power, influence and connections in order to ensure that Plaintiff was unable to gain admission to F.I.T. or a comparable school, and that they would destroy her career, just as they had destroyed the careers of others who had failed to comply with their demands.

62. Defendants Epstein and Maxwell continued to provide Plaintiff with things of value in exchange for Plaintiff's continued compliance with Epstein's sexual demands; however, they failed and refused to perform their promises to help Plaintiff be admitted to F.I.T. or another school, or to provide financial support for

college admission or on-going education, false promises they repeatedly made in order to coerce her into commercial sex acts.

63.   Defendants' sexual demands on Plaintiff continued while she was in New York City, in the Southern District of New York, or in other locations in close proximity to the Defendants.  In addition to their requiring Plaintiff to provide Defendant Epstein with sex acts, each of the Defendants continued to pressure her to lose excessive amounts of body weight and offered her no opportunity to decline or resist their instructions.

64.  In May, 2007, Plaintiff left the United States and did not return.  Between returning from South Africa in February 2007 and leaving in May 2007, Defendants Kellen, Groff, and Maxwell each continued to repeatedly make false representations to Plaintiff, including false and fraudulent representations that she would be admitted to F.I.T. if she continued to engage in sex with Epstein. Defendant Epstein continued to make similar false and fraudulent promises in order to have sex with Plaintiff.

65.  In and after May 2007, Defendants actively concealed and covered up what they had done to Plaintiff and other similarly situated females.  Defendant's cover-up included efforts to intimidate witnesses who might provide corroborating testimony to Plaintiff as well as destruction of documents and other evidence regarding what they had done.

66. Unknown to Plaintiff, Defendants' representations and promises to Plaintiff were all false and fraudulent. Plaintiff reasonably relied on the representations and promises of the Defendants. Plaintiff also considered the Defendants' threats against the current and future well-being and safety of Plaintiff to be real and credible. All such representations, promises, and threats were made solely for the purpose of coercing and otherwise inducing Plaintiff into prolonged sexual compliance. Defendants knowingly benefitted financially and received things of value as a result of coercing and inducing Plaintiff into sexual compliance and otherwise participating in their illegal venture and enterprise.

## COUNT I
## CAUSE OF ACTION AGAINST DEFENDANTS PURSUANT TO 18 U.S.C. § 1595

67. Plaintiff adopts and realleges paragraphs 1 through 66 above.

68. Defendants individually and together, within the special maritime and territorial jurisdiction of the United States, in interstate and foreign commerce, and/or affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, maintained, patronized, solicited, threatened, forced, and coerced Plaintiff to engage in commercial sex acts. Such actions by Defendants were undertaken with knowledge and/or reckless disregard of the fact that their threats of force, fraud, coercion, and combinations of such means would

be used, and were in fact used, in order to cause Plaintiff to engage in commercial sex acts. In so doing, Defendants violated 18 U.S.C. §1591.

69. Additionally, Defendants Epstein, Maxwell, and Kellen, individually and together, knowingly concealed, removed, confiscated, and possessed Plaintiff's passport and associated immigration documents, in the course of violating 18 U.S.C. § 1591, and with the intent of violating 18 U.S.C. § 1591, and to prevent, restrict, attempt to restrict, without lawful authority, Plaintiff's liberty to move or travel, in order to maintain the sexual services of Plaintiff, while Plaintiff was a victim of a severe form of sex trafficking, as defined in section 103 of the Trafficking Victims Protection Act of 2000, enacted in 22 U.S.C. § 7102. In so doing, Defendants violated 18 U.S.C. § 1592. These Defendants also obstructed, and attempted to obstruct and to interfere with the enforcement of 18 U.S.C. § 1592.

70. Additionally, Defendants knowingly benefitted, financially and by receiving things of value, from participating in a venture (the Epstein sex trafficking venture enterprise) which had engaged in acts in violation of 18 U.S.C. § 1592 and 1595(a), knowing that the venture had engaged in such violations. In so doing, Defendants violated 18 U.S.C. § 1593A.

71. Additionally, Defendants attempted to violate 18 U.S.C. § 1591. In so doing, Defendants violated 18 U.S.C. § 1594(a).

72.  Additionally, Defendants conspired with each other, and with other persons known and unknown, to violate 18 U.S.C. § 1592.  In so doing, Defendants violated 18 U.S.C. § 1594(b).

73.  Additionally, Defendants conspired with each other, and with other persons known and unknown, to violate 18 U.S.C. § 1591.  In so doing, Defendants violated 18 U.S.C. § 1594(c).

74.  By virtue of their violations of 18 U.S.C. §§ 1591, 1592, 1593A, and 1594, Defendants are subject to civil causes of action under 18 U.S.C. § 1595 by Plaintiff, who is a victim of their violations.

75.  Certain property of Defendant Epstein's was essential to the commission of the federal crimes and torts described herein, including the use of multiple private aircraft including a Boeing aircraft (of make and model B-727-31H with tail number N908JE) and a Gulfstream aircraft (of make and model G-1159B with tail number N909JE).  Such aircraft, along with other of Defendants' property, were used as means and instruments of Defendants' tortious and criminal offenses and, as such, are subject to forfeiture.

76.  Additionally, Defendant Epstein's New York mansion, located at 9 East 71st Street, New York, New York, in the Southern District of New York, and his private island located in the United States Virgin Islands, were used as means and

instruments of Defendants' tortious and criminal offenses and, as such, are subject to forfeiture.

77. As a direct and proximate result of Defendants' commission of the aforementioned criminal offenses enumerated in 18 U.S.C. § 1591, 1592, 1593A, and 1594, and the associated civil remedies provided in § 1595, Plaintiff has in the past suffered and will continue to suffer injury and pain; emotional distress; psychological and psychiatric trauma; mental anguish; humiliation; confusion; embarrassment; loss of self-esteem; loss of dignity; loss of enjoyment of life; invasion of privacy;  and other damages associated with Defendants' actions. Plaintiff will incur further medical and psychological expenses.  These injuries are permanent in nature and Plaintiff will continue to suffer from them in the future. In addition to these losses, Plaintiff has incurred attorneys' fees and will be required do so in the future.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory and general damages, attorney's fees, punitive damages and such other and further relief as this Court deems just and proper.  Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

Dated:  June 5, 2017.

Respectfully Submitted,

FARMER, JAFFE, WEISSING. EDWARDS, FISTOS, LEHRMAN, P.L.

By: */s/ Bradley J. Edwards*
Bradley J. Edwards
425 N. Andrews Ave., Suite 2
Fort Lauderdale, FL 33301
(954)-524-2820
Fax: (954)-524-2822
Email: brad@pathtojustice.com
*PRO HAC VICE*

BOIES, SCHILLER & FLEXNER LLP
David Boies
Boies Schiller & Flexner LLP
333 Main Street
Armonk, NY 10504
(919) 749-8200
Fax: (914) 749-8300  Email: dboies@bsfllp.com

Sigrid McCawley
Meredith Schultz
Boies Schiller & Flexner LLP
401 East Las Olas Blvd., Ste. 1200
Fort Lauderdale, Florida 33301
(954) 356-0011
Fax:
Email: smccawley@bsfllp.com
Email: mschultz@bsfllp.com
*PRO HAC VICE*


Paul G Cassell
S.J. Quinney College of Law at the University of Utah
383 S. University Street
Salt Lake City, UT 84112-0730
(801)-585-5202
Fax: (801)-585-2750
Email: cassellp@law.utah.edu [*]
*PRO HAC VICE*

---

[*] This daytime business address is provided for identification and correspondence purposes only and is not intended to imply institutional endorsement by the University of Utah for this private representation

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 5th day of June, 2017, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system. I also certify that the foregoing document is being served this day on the individuals identified below via transmission of Notices of Electronic Filing generated by CM/ECF.

STEPTOE & JOHNSON, LLP
Michael C. Miller
Justin Y.K. Chu
mmiller@steptoe.com, cjenkins@steptoe.com, pparker@steptoe.com
jchu@steptoe.com, cjenkins@steptoe.com, pparker@steptoe.com, psafirstein@steptoe.com

*Attorneys for Defendants*
*Jeffrey Epstein & Lesley Groff*

ALSTON & BIRD, LLP
John E. Stephenson, Jr.
Alexander S. Lorenzo
alexander.lorenzo@alston.com, autodocket-nyc@alston.com,
managingclerksoffice-nyc@alston.com, john.stephenson@alston.com

*Attorneys for Defendant Sarah Kellen*

By: */s/ Bradley J. Edwards*